**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 06a0060n.06**
**Filed: January 23, 2006**

**No. 04-4407**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JACQUELINE M. SCOTT, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| FIRSTMERIT CORPORATION, | ) | NORTHERN DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellee. | ) | |

Before: NELSON, DAUGHTREY and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. The district court in this case granted FirstMerit Corporation's motion for summary judgment, rejecting Jacqueline Scott's federal and state claims for disability and race discrimination arising from FirstMerit's decision to discharge her for falsification of bank records. Because Scott has failed to establish a cognizable claim that FirstMerit's proffered nondiscriminatory justification for her discharge was a pretext for discrimination, we affirm.

I.

FirstMerit provides banking and other financial services and is based in Akron, Ohio. The company operates 158 banking offices in Ohio and Pennsylvania.

In 1974, Jacqueline Scott, an African-American, began working for FirstMerit as a file clerk. In 1997, she became a customer service representative, and in 1998 she accepted a position as a personal banking representative. D. Ct. Op. at 2.

In May 2000, Scott was forced to take a medical leave of absence following a workplace injury to her right wrist. The injury developed into a "permanent, painful condition" known as reflex sympathy dystrophy, which "prevent[ed] Scott from lifting objects as light as a coffee mug with her right hand." Scott Br. at 4. When she eventually returned to work, the injury prevented her from working a full eight-hour day. Attempting to accommodate this restriction, FirstMerit reassigned her to a customer service position, one that allowed her to work reduced hours. *See* D. Ct. Op. at 2. In the new position, she received the same pay and benefits as she had received before the injury. At some point after she returned to work, Scott claims that the once-amicable relationship between her and her supervisor, Mark Cicchinelli, changed. In particular, he "constantly hounded" her to get a medical release that would allow her to return to working an eight-hour day. JA 457.

On Friday, March 22, 2002, a customer asked Scott to remove an erroneous $34 charge from his account, requiring Scott to prepare an affidavit to correct the bank's admitted mistake. While typing the affidavit and simultaneously speaking with her co-worker, Cindy Smith, Scott claims that she "unintentional[ly]" and "unconscious[ly]" entered "Cindy Smith" in a space on the affidavit marked "originated by." JA 456; D. Ct. Op. at 3. The customer signed the document, another employee notarized the customer's signature and Scott submitted the document for processing. D.

Ct. Op. at 3. Because Scott used a P.O. Box in completing the document rather than a street address, as required for this kind of transaction, the electronic banking department of FirstMerit did not process the document. And because Smith's name appeared on the document as its originator, the department contacted her regarding the document. Realizing that she had not prepared the document, Smith reported the incident to Cicchinelli, who referred the matter to FirstMerit's security department for an internal investigation.

FirstMerit's security officer, Lane Orem, conducted the investigation, during which he reviewed a written statement from the notary about the incident and separately interviewed Smith and Scott. During Scott's interview, Orem questioned her about her relationship with the customer whose erroneous charge had prompted her to prepare the affidavit. Although Scott answered that she did "not really" know the customer, she revealed that she knew the street on which the customer lived, even though the false affidavit at issue did not list that address (as required) but instead listed a P.O. Box. JA 491. Orem did not interview the customer. Orem concluded that Scott knew the customer "better than she was admitting" and that the use of Cindy Smith's name was a misrepresentation because Scott was asked in the affidavit to enter her own name. JA 377 ("How do you type your wrong name? . . . How do you type somebody else's name on a form?"); JA 490–91 ("When I asked if [Scott] knew [the customer], [Scott] stated 'not really,' but when I asked her where [the customer] lived, [Scott] stated he lived on Bacon St. in Akron. It was clear at that point that [Scott] knew [the customer] better than she was admitting [ ] because the affidavit showed

a PO Box for the address."). On April 12, 2002, at the conclusion of Scott's interview, Orem suspended her pending a final decision by FirstMerit's performance review committee.

On April 16, 2002, the performance review committee met to hear Orem's findings and recommendation. Comprised of Michael Williams, Joanne Post, Michael Hormula and Earlene Balestrino, the committee followed Orem's recommendation and unanimously decided to discharge Scott for "falsification of bank records." JA 492 (performance review committee log).

On July 15, 2003, Scott filed this lawsuit in Ohio state court, alleging disability discrimination in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and race discrimination in violation of Title VII, 42 U.S.C. § 2000e, *et seq.* She also claimed that the bank had violated analogous state laws, *see* Ohio Rev. Code Ann. § 4112.02, as well as a state law against wrongful discharge in violation of public policy. FirstMerit removed the case to federal court and moved for summary judgment. The district court granted FirstMerit's motion, concluding that Scott had failed to establish a prima facie case of federal or state discrimination based on disability or race, D. Ct. Op. at 7–17, and alternatively concluding that Scott had failed to show that FirstMerit's nondiscriminatory reason for discharging her was a pretext for discrimination, *id.* at 11–14, 17. The district court also granted summary judgment to FirstMerit on Scott's state-law wrongful-discharge claim. *Id.* at 17–18.

II.

On appeal, Scott challenges the district court's decision with respect to the federal and state race and disability discrimination claims but does not challenge the dismissal of her state-law wrongful-discharge claim. We give fresh review to a district court's summary-judgment decision and apply the same Rule 56 standard that the district court applied. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 569 (6th Cir. 2003).

A.

Under Title VII, "[a] plaintiff may establish a prima facie case of discrimination either by presenting direct evidence of intentional discrimination by the defendant or by showing the existence of circumstantial evidence which creates an inference of discrimination." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995) (citations omitted). Scott concedes that she has not presented direct evidence of discrimination, *see* Scott Br. at 15, meaning that her claim must be analyzed under the familiar burden-shifting framework used to establish indirect evidence of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under that standard, Scott first must establish a prima facie case of discrimination, which requires her to show that "(1) she was a member of a protected class; (2) she was discharged; (3) she was qualified for the position;" and (4) "that for the same or similar conduct [she] was treated differently than similarly-situated" employees outside the protected class. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir. 1992). If she can establish her prima facie case, the burden shifts to FirstMerit to

offer a legitimate nondiscriminatory reason for Scott's discharge. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–56 (1981).

In the event FirstMerit provides a nondiscriminatory reason for the discharge, the burden shifts back to Scott to prove "by a preponderance of the evidence" that FirstMerit's proffered reason was merely a pretext for illegal discrimination. *Id.* at 252–53. To establish "a submissible case on the credibility of [FirstMerit's] explanation," Scott must demonstrate "(1) that the proffered reason[] had no basis in fact, (2) that the proffered reason[] did not actually motivate [her] discharge, or (3) that [it was] insufficient to motivate discharge." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (internal quotation and emphasis omitted). Because a jury "may not reject an employer's explanation . . . unless there is a sufficient basis *in the evidence* for doing so," *id.* at 1083; *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 724 (6th Cir. 2004), Scott must produce evidence from which a reasonable jury could find pretext in order to overcome FirstMerit's motion for summary judgment.

We have some doubt that Scott has established a prima facie case of discrimination under Title VII, primarily because she does not appear to have shown that she "was treated differently than similarly-situated" employees outside the protected class. *Id.*; *see* D. Ct. Op. at 7–11. But we need not resolve that point because she has not created a triable issue of fact over whether FirstMerit's explanation for her discharge was a pretext for discrimination.

As an initial matter, Scott cannot tenably rely on the first ground for establishing pretext—that the "proffered reason[]" for the discharge "had no basis in fact." *Manzer*, 29 F.3d at 1084. "[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). "In order to determine whether [FirstMerit] had an 'honest belief' in the proffered basis for the [discharge], this Court looks to whether [FirstMerit] can establish its 'reasonable reliance' on the particularized facts that were before it at the time the decision was made." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001). And while "the key inquiry is whether [FirstMerit] made a reasonably informed and considered decision," an employer's investigation is not required to leave "no stone unturned." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).

Consistent with these decisions, FirstMerit has pointed to "particularized facts that were before it at the time the decision was made" and that legitimately could support its stated reason for discharging Scott. *Majewski*, 274 F.3d at 1117. Most particularly, FirstMerit relied on Scott's admission that she entered another employee's name as her own in completing the affidavit. JA 54, 56 (Scott Dep.); JA 490 (investigation report stating: "When I showed [Scott] the affidavit . . . [she] admitted to typing the document and typing Cindy[] [Smith's] name on it."). Performance review committee member Earlene Balestrino stated in her affidavit that this fact was the basis of the committee's decision to discharge Scott. JA 45 ("The only reason [for the discharge] was that

[Scott] prepared the affidavit identifying another employee as the originator of the affidavit when in fact she was not."). And investigator Orem's report and testimony indicated that he concluded Scott committed a misrepresentation when she entered Smith's name on the affidavit instead of her own. *See* JA 377 ("My opinion is she typed someone else's name on a bank document. She misrepresented that document, period."); JA 490–91 (Orem investigation report).

Seeking to counter this conclusion, Scott attacks the adequacy of Orem's investigation, claiming (1) that Orem should have interviewed the customer whose account was at issue because it would have shown that she was attempting to correct another employee's error and that she did not have an inappropriate relationship with the customer under bank policy, Scott Br. at 20, and (2) that Orem should have "asked about Scott's job duties[,] her 28-year history with the company" and her "reputation for honesty," *id.* at 24. The absence of an interview with the customer does not advance Scott's claim. The bank never acted upon the assumption that Scott was attempting to correct her own mistake in preparing the affidavit. And it is doubtful that the customer could have shown that Scott did not know him because he in fact filed an affidavit in this case, in which he never states that he did not know Scott or did not know Scott well. *See* JA 266–67. Scott also offers no explanation why further information about her job duties, job history and reputation would have changed matters. The dispositive fact, according to the bank, was that she admitted to entering another person's name as the originator of the affidavit. In the words of the district court, "the law does not require that the investigation be perfect, only that an honest belief be held for the action." D. Ct. Op. at 13.

Nor does *Nemet v. First Nat'l Bank of Ohio*, No. 98-4076, 1999 U.S. App. LEXIS 31979 (6th Cir. Nov. 22, 1999), aid Scott in establishing that Orem's investigation should have included an interview of the customer. In *Nemet*, an interview of the customer would have revealed that the discharged employee could not have been responsible for the act that led to his discharge. *See id.* at *16 (investigation would have revealed that the plaintiff could not have erased the security tape as alleged by the employer at the time of discharge). Scott makes no such claim here and accordingly has not demonstrated how this alleged gap in the investigation rendered the performance review committee's decision to discharge her any less "reasonably informed and considered." *Smith*, 155 F.3d at 807.

Scott also argues that the "'honest belief' rule is [ ] not available when an employer tosses out a number of reasons to support an employee's termination in hopes that one will stick" and that these changing reasons presented a "moving target." Scott. Br. at 24. As the district court made clear, however, FirstMerit's reason for discharging Scott has uniformly been that she was guilty of falsifying a bank document. That various communications from FirstMerit to Scott called the offense by slightly different names or that Orem noted in his deposition and report that he was troubled by Scott's lack of candor about her relationship with the customer does not support Scott's assertion that the underlying justification for the dismissal was a "moving target." In this respect, we again agree with the district court (D. Ct. Op. at 14) that "[t]here is no evidence that [FirstMerit] has offered changing reasons for [Scott's] termination": From beginning to end, the bank's overriding concern was Scott's use of a name other than her own in completing the affidavit.

Scott next invokes the last two *Manzer* factors, claiming that the unreasonableness of the discharge decision, *see* Scott Reply Br. at 1 ("In order to fire Jacqueline Scott, FirstMerit had to make a mountain out of a molehill."), creates a triable issue of fact over whether the "proffered reason" for the discharge "actually motivate[d]" it or was "insufficient to motivate" it, *Manzer*, 29 F.3d at 1084 (emphasis omitted). In support of this argument, she cites *Wexler*, 317 F.3d at 576, which notes that "[a]n employer's business judgment . . . is not an absolute defense to unlawful discrimination" and that "the reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the [discharge] was its actual motivation."

Viewed in isolation, FirstMerit's decision to discharge Scott seems unmercifully draconian—given Scott's lengthy tenure with FirstMerit, the small amount of money involved and the fact that it remains unclear how she could have benefitted financially from her actions. But Scott did not stand alone in this respect. So far as the record shows, FirstMerit was equally unforgiving with many other employees when it came to falsification charges. And the fact remains that Scott worked for a bank, which has ample reason for requiring that its employees ensure the accuracy of bank documents for which they are responsible. FirstMerit has several policies aimed at "preserving the accuracy and integrity of its bank documents," JA 46 (Balestrino affidavit), 493–98, and its commitment to these policies is evidenced by the dismissal of 24 employees, including Scott, for committing offenses involving falsification during 2001 and 2002. *See* JA 347–48 (summary of dismissals for falsification). Several of these dismissed employees, we should add, claimed that the

falsification for which they were discharged stemmed from a mistake or an equivalently minor transgression. *See* JA 80–83 (employee discharged for falsification of a mileage-reimbursement claim (for 36 miles) where the employee claimed that she "didn't worry about changing the [incorrect mileage entry] because [she] did [make the trip] just not on the day the sheet said"); JA 92 (employee discharged despite her claim that the falsification was "only . . . a mistake"); JA 99 (employee discharged for "forcing" her money drawer to balance when it was short $8 even though she believed it was actually $2 over); JA 347 (employee discharged for "contribut[ing] $141 of her own money to cover overpayment to customer" at her "supervisor's direction"); *Id.* (employee discharged for "forcing" her money drawer to balance when the total amount at issue was approximately $25).

Nor, as the above actions suggest, can Scott show that "other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which [FirstMerit] contends motivated its discharge of [Scott]." *Manzer*, 29 F.3d at 1084. While Scott points to two employees who were not fired after they "failed to adequately check a signature card, thereby allowing an imposter access to a dead customer's safe deposit box," Scott Br. at 19, she has not alleged (or shown) that they made a misrepresentation on an internal bank document. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (holding that an "employee with whom the plaintiff seeks to compare . . . herself must be similar in all of the relevant aspects") (internal quotation omitted). And while Scott points to the employee who notarized the customer's signature on the affidavit, "did not find Scott's error" and

"was not terminated for it," Scott Reply Br. at 6, she has not shown that the notary's job consisted of doing anything more than notarizing the customer's signature, as opposed to notarizing the accuracy of anything else on the document. For like reasons, Scott has not shown that the bank's treatment of employees who failed to complete their time cards accurately was "similar in all of the relevant aspects," *Ercegovich*, 154 F.3d at 352, primarily because it is one thing for a bank to ensure accuracy about records documenting money flowing into and out of the bank and another to ensure the accuracy of its employees' time cards.

Against this backdrop, we cannot say that Title VII gives Scott a right to take this claim to a jury to determine whether the bank's "proffered reason[]" for the discharge "actually motivate[d]" it or was "insufficient to motivate" it. *Manzer*, 29 F.3d at 1084. Scott worked in an industry where the need for accuracy in its official documents is self-evident, *see, e.g.*, JA 56 (deposition testimony in which Scott admits that it is "vital that the information [ ] contained in [the] documents [she completed] be absolutely correct"), and worked for a bank that discharged a number of employees during 2001 and 2002 who were outside the two protected classes and who were guilty of similar falsification offenses. Accordingly, the district court correctly rejected this claim as a matter of law.

B.

As with her Title VII claim, Scott admits that there is no "direct evidence" of discrimination supporting her ADA claim. Scott Br. at 15. And as with a Title VII claim, an ADA claim seeking to establish discrimination by indirect evidence is analyzed according to the *McDonnell Douglas*

burden-shifting framework. *Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 660 (6th Cir. 1999). To establish a prima facie case of disability discrimination, Scott bears the burden of demonstrating that: "(1) [s]he is disabled; (2) [s]he [was] otherwise qualified for the position; (3) [s]he suffered an adverse employment decision; (4) [FirstMerit] knew or had reason to know of h[er] disability; and (5) after [her discharge], the position remained open, or [she] was replaced by a member outside the protected class." *Hopkins*, 196 F.3d at 660; *see also Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 n.11 (6th Cir. 1996) (listing these elements and indicating that the "precise characterization of the fifth prong of the test will sometimes vary depending upon the factual scenario confronting the court").

It remains unclear, as an initial matter, whether Scott has established a prima facie case of disability discrimination, most notably because she has not demonstrated that any of the decisionmakers knew that she was disabled. It is undisputed that neither the investigator (Orem) nor the four members of the performance review committee (Williams, Post, Hormula and Balestrino) knew of her disability. The only person who did, Cicchinelli, merely recommended Scott for an internal investigation, had no other involvement in the investigation and did not participate in the performance review committee's decision to discharge Scott.

As with Scott's Title VII claim, however, we need not rest our resolution of the appeal on this ground. Even if she had established a prima facie case, Scott has not met her burden of establishing that FirstMerit's proffered nondiscriminatory justification was a pretext for discrimination for the reasons stated above.

C.

On appeal, neither party argues that the state-law discrimination claims should be analyzed differently than their federal-law counterparts. Nor can we identify any reason why the state-law claims should be treated differently, and accordingly we will resolve them in the same way under the same framework. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 538 (6th Cir. 1999) ("The Ohio courts have held that the evidentiary standards and burdens of proof applicable to a claimed violation of Title VII . . . are likewise applicable in determining whether a violation of Ohio Rev. Code § 4112 has occurred. Thus, the federal case law governing Title VII actions is generally applicable to cases involving alleged violations of Chapter 4112."); *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004) ("Because neither party has argued that an action for handicap discrimination under Ohio law entails a different legal analysis than that for disability discrimination under the ADA, and because Ohio case law tends to suggest that it entails the same legal analysis as that under the ADA, we will analyze plaintiff's state and federal discrimination claims under Ohio Revised Code § 4112 and the ADA, respectively, solely under the ADA.").

III.

For these reasons, we affirm.