NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0652n.06

**No. 13-3537**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| DEBORAH ANN DOUGLAS, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellant, | ) | Aug 20, 2014 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | **ON APPEAL FROM THE** |
| EATON CORPORATION, | ) | **UNITED STATES DISTRICT** |
| | ) | **COURT FOR THE** |
| Defendant-Appellee. | ) | **NORTHERN DISTRICT OF** |
| | ) | **OHIO** |
| | ) | |
| | ) | |

BEFORE:    SUHRHEINRICH, GIBBONS, and COOK, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.**   Deborah Douglas worked for Eaton Corporation as a controller in both its American and foreign offices. In 2006, Douglas accepted a three-year international assignment in China, which was extended for an additional year. At the conclusion of the assignment, Eaton terminated Douglas. Eaton then replaced Douglas with a younger man from Singapore. Douglas sued, asserting age, sex, and national-origin discrimination claims. The district court granted summary judgment for Eaton on all claims. We agree that no issue of material fact exists and therefore affirm the judgment.

**I.**

Douglas is a sixty-year-old female who was born in the United States. She started working for Eaton, a power-management company, in 1994. Eaton is headquartered in Cleveland, Ohio, but has offices all over the world.

Because of its global footprint, Eaton encourages its employees to accept temporary assignments to other countries, known as "expatriate assignments." In doing so, Eaton tells its employees that "[i]t is possible that a suitable job may not exist upon repatriation" and "every employee . . . should take responsibility for managing his or her career." If an employee cannot find an open position in the United States, Eaton promises to work with her "on the applicable termination or separation from service processes."

Douglas worked in Canada for five years as a controller under this policy. After her assignment ended, she returned to the United States and accepted a position as controller in Eaton's Pittsburgh office. Three years later, Eaton promoted Douglas to Division Controller, and Douglas accepted a three-year expatriate assignment to Shanghai, China.

While Douglas was in China, Eaton reorganized its business. As a result of this reorganization, Eaton raised Douglas's salary and changed her title to Vice President of Finance and Planning. Eaton then asked Douglas if she would be willing to extend her assignment for another year. Douglas agreed.

Everything was fine until six months before the end of Douglas's assignment. Then, Douglas met with Jim Sternweis, her boss, to discuss her job. Douglas says that she told Jim she would be willing to stay in China until the right position opened up in the United States. Eaton, however, says that Douglas said she wanted to repatriate within six to nine months. After this conversation, Eaton decided not to extend Douglas's assignment and instead started the repatriation process.

Two months later—roughly four months before Douglas's scheduled repatriation—Sternweis told Douglas about an open position in Pittsburgh, working as Director of Finance in the Electrical Components Organization. Douglas applied for the position and asked if the salary

could be raised to match her current salary band. Eaton did not raise the salary band, but assured Douglas that her salary would be grandfathered for two years, which would give her time to find another position at a higher salary band. Considering the position a demotion, Douglas withdrew her name from consideration. Eaton then offered Douglas another position, again at a lower salary band, and Douglas refused for the same reason. Douglas applied for various other positions in the company, but Eaton ultimately rejected each application.

While Douglas was trying to find a new position in the United States, the Shanghai office was searching for her replacement. Sternweis contacted other Eaton executives and finance professionals to ask for recommendations. A finance leader from Eaton's Industrial Sector responded and recommended Kok Meng Tang for the position. Tang, who was forty-six at the time, is a native of Singapore. After interviewing Tang and reviewing his performance evaluations, Sternweis hired him to fill Douglas's former position. Eaton says that Tang's ability to speak Chinese and his experiences living and working in Singapore, Australia, Japan, and China factored into its decision to hire him.

Eaton gave Douglas a few months' extension to ease Tang's transition and to allow her more time to find an open position. During this time, Douglas continued to refuse equivalent positions in a lower salary band. Ultimately, Douglas never found another position at Eaton, and Eaton sent her a letter confirming the termination of her employment.

Douglas sued Eaton in state court, bringing an age discrimination claim under the ADEA, sex and national-original discrimination claims under Title VII, and parallel discrimination claims under Ohio state law. Eaton removed the case to federal court and filed a motion for summary judgment. The district court granted Eaton's motion on all claims, holding that

Douglas had failed to establish that she suffered any adverse employment action. Douglas appeals.

**II.**

We review a district court's grant of summary judgment *de novo*. *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 453 (6th Cir. 2001). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In deciding motions for summary judgment, we draw all reasonable inferences in favor of the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The ultimate inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

**III.**

In the absence of direct evidence of discrimination,[1] we analyze claims of intentional age, sex, and national-origin discrimination using the *McDonnell Douglas* burden-shifting

---

[1] Direct evidence is evidence that requires the conclusion, without any inference, that unlawful discrimination was at least a motivating factor in an employer's actions. *See Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). Douglas argues that she has direct evidence of national-origin discrimination because Eaton has a stated preference for "local" candidates. We agree with the district court that this is not direct evidence of national-origin discrimination. The record shows that Eaton prefers individuals who live or have lived in a particular region, speak the local language, and are familiar with the local customs, business practices, cultures, and markets. However, Eaton does not have a preference for people who are born in, or whose ancestors are from, a particular region. Under Eaton's policy, an individual born outside a

framework. *Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). We do the same for Douglas's state discrimination claims. *Scott v. FirstMerit Corp.*, 167 F. App'x 480, 487 (6th Cir. 2006). Under this framework, Douglas must present evidence that would allow a reasonable jury to conclude that she established a *prima facie* case of discrimination. To do so, she must demonstrate that (1) she was a member of a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified for the position, and (4) she was replaced by someone outside the protected class or that Eaton treated similarly situated, nonprotected employees more favorably. *See Geiger*, 579 F.3d at 622; *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002). If Douglas establishes a *prima facie* case, Eaton must articulate a legitimate, nondiscriminatory reason for the adverse action. *See Yeschick v. Mineta*, 675 F.3d 622, 632 (6th Cir. 2012). The burden then shifts back to Douglas to prove that the reasons offered by Eaton were pretextual. *See id.*

We disagree with the district court's conclusion that this case should be resolved at the *prima facie* stage. Instead, we turn to the issue of pretext, which provides a ready path for resolution of the case. *See Dixon v. Clem*, 492 F.3d 665, 673 (6th Cir. 2007) ("[W]e 'may affirm on any grounds supported by the record even if different from the reasons of the district court.'" (quoting *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002))).

Eaton says that it ended Douglas's employment in accordance with the terms of its international assignment policy. This is a legitimate, nondiscriminatory reason. *See Blackshear*

particular region may still be considered local if she has lived in the region long enough to become familiar with it. Therefore, Eaton's policy is circumstantial evidence because an inference of discriminatory animus is necessary. *See Norbuta v. Loctite Corp.*, 1 F. App'x 305, 313 (6th Cir. 2001) (holding that employer's preference for hiring a Canadian manager in its Canadian operations did not constitute direct evidence of national-origin discrimination).

*v. Interstate Brands Corp.*, 495 F. App'x 613, 618 (6th Cir. 2012) (finding that employer had presented a legitimate, nondiscriminatory reason when it terminated an employee according to company policy); *Hollins v. Atl. Co.*, 188 F.3d 652, 661 (6th Cir. 1999).

Douglas may prove pretext by showing that this reason (1) has no basis in fact, (2) was not the actual reason, or (3) was insufficient to explain the employer's action. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008). Douglas bears the ultimate burden of producing sufficient evidence from which a jury could reasonably reject Eaton's explanation and infer that it intentionally discriminated against Douglas. *See id.* (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003)). We hold that Douglas fails to meet this burden as to all of her discrimination claims.

**A.**

Douglas makes similar arguments regarding her claims of age and sex discrimination. She first argues that Eaton's reliance on its international assignment policy has no basis in fact because she told Eaton that she wanted to renew her assignment. Eaton disagrees, contending that Douglas told the corporation that she wanted to repatriate. Douglas points to the different accounts of her conversation with Sternweis and argues that her claims should survive summary judgment based on this dispute of fact. But Douglas must do more than show an issue of fact. She must also show that the dispute is material. *See* Fed. R. Civ. P. 56(a). That she cannot do because the details of Douglas's conversation with Sternweis are immaterial to the pretext determination. Douglas's manager testified that Douglas would have been repatriated regardless of her wishes. And, more importantly, Douglas's international assignment letter says that her assignment was scheduled to end in 2010. Douglas identifies no evidence to refute these facts,

and her subjective wish to extend her assignment is not enough to show that Eaton's decision had no basis in fact, much less that it was motivated by discriminatory animus of any kind.

Next, Douglas argues that company policy was not the actual reason for Eaton's actions because it treated similarly situated, younger male employees more favorably. To support her argument, Douglas identifies five younger males who obtained positions with Eaton after their international assignments ended. Notably, Douglas fails to offer any evidence that allows us to meaningfully evaluate Eaton's treatment of the five employees as compared to Eaton's treatment of Douglas. In fact, the slim evidence in the record indicates that Eaton followed its neutral international assignment policy with respect to each of the five employees. *See Goldfaden v. Wyeth Labs., Inc.*, 482 F. App'x 44, 49 (6th Cir. 2012) ("None of these incidents show that [the employer] treated similarly situated male employees differently than [the plaintiff.]"). Even so, the mere fact that Eaton found new positions for its younger male employees upon the conclusion of their international assignments could demonstrate that Eaton's policy rationale was a pretextual gloss. *See Diebel v. L&H Res., LLC*, 492 F. App'x 523, 531 (6th Cir. 2012). However, it is undisputed that Eaton also terminated the employment of several younger male employees upon the conclusion of their international assignments, just as it did with Douglas. This fact dispels any possible inference of discrimination created by the comparison. *See Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 558 (7th Cir. 1987) (finding that evidence of similarly situated employees outside the protected class who were treated the same as the plaintiff demonstrated an absence of pretext).

Douglas also contends that Eaton's attempts to place her in lower-paid positions are evidence of discriminatory motive. Even assuming that Douglas is correct that these positions were demotions, the mere fact that Eaton offered her employment in lesser positions does not

show that it fired her out of discriminatory animus. Rather, Eaton's offer to move her into another position, while paying her the same salary, to allow her to continue searching for more acceptable positions within the company demonstrates a lack of animus. And Douglas does not offer any evidence showing that discriminatory animus was the reason she was not selected for the other positions she desired.

In addition to the above arguments, Douglas offers several comments made about her abrasive communication style as evidence that Eaton really fired her because she is a woman. These comments, given during Douglas's evaluations, range from admonishing Douglas for lacking patience with her coworkers, to having a confrontational communication style, to over-working her subordinates. Significantly, none of these comments inappropriately links Douglas's management traits to her sex, nor do they suggest that Douglas's managers were stereotyping based on her sex. *Cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 235 (1989) (plurality opinion) (discussing descriptions of a woman as "macho," "overcompensate[ing] for being a woman," and being a "lady using foul language"); *Lindahl v. Air Fr.*, 930 F.2d 1434, 1439 (9th Cir. 1991) (finding that evidence could show that a manager made his decision on the basis of stereotypical images of men and women after comparing his statements about female candidates to his statements about a male candidate). Therefore, we hold that the comments are likewise insufficient to establish pretext.

**B.**

Douglas also fails to establish pretext regarding her claim for national-origin discrimination. Douglas offers evidence that Eaton prefers to hire employees local to the area surrounding its international locations. But, as Eaton points out, the fact that the company prefers to hire local candidates who speak the language and are familiar with the local customs

does not mean that it prefers to hire candidates who are born in the country or who have the same national origin as the home country, nor does it suggest that Eaton fired Douglas because she was American and not Chinese. *See Norbuta*, 1 F. App'x at 311 ("Title VII prohibits discrimination in employment based on an employee's national origin. 'National origin' refers to the country of birth, or the country from which a person's ancestors came." (internal citation omitted) (citing *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88–90 (1973))).

**IV.**

For the above reasons, we affirm the district court's grant of summary judgment in favor of Eaton.