NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0178n.06

No. 15-1720

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

JERRICK J. RODRIQUES,

      Plaintiff-Appellant,

v.

DELTA AIRLINES, INC.,

      Defendant-Appellee.

FILED
Mar 29, 2016
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

BEFORE:    CLAY, GILMAN, and GRIFFIN, Circuit Judges.

    **CLAY, Circuit Judge.** Plaintiff Jerrick J. Rodriques appeals the district court's orders granting summary judgment to Defendant Delta Airlines and denying Plaintiff's motion for reconsideration on his employment discrimination and retaliation claims brought under Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101, *et seq.*, over which the district court had jurisdiction pursuant to 28 U.S.C. § 1332. For the reasons that follow, we **AFFIRM**.

## BACKGROUND

### Factual Background

    From 1995 until his discharge on January 9, 2013, Plaintiff was a ground crew worker at the Detroit Metropolitan Wayne County Airport, initially for Northwest Airlines and, after the Delta-Northwest merger in 2009, as an employee of Defendant Delta Airlines. At the time of his termination, Plaintiff was an "Aircraft Load Agent/Real Time Staffing" ("ALA/RTS"). ALAs,

who are supervised by "Performance Leaders," work out of Delta's Control Center and are responsible for "work coordination, computation of aircraft weight and balance, and also oversee and assist on the ramp with offloading and loading aircraft." (R. 19–4, Kotula Decl. ¶ 4 at Page ID 399.)   As an RTS, he was "over the other ALAs," who would come to him for job assignments.  (R. 25–2, Rodriques Dep. at Page ID 786.)   When he was interviewed for an ALA/RTS position, Plaintiff was the only black person to be selected.

Plaintiff had an ID card, which he was required to swipe to enter the employee parking lot.  As an hourly employee, Plaintiff was also required to punch into and out of Delta's time clocks, either by swiping his badge or punching in his Delta ID number.  The time clocks in turn fed into a central system, which kept track of which employees are working and can generate reports of when and where employees punched in and out.  Employees can determine whether they or other employees are punched in or out by looking at RTS screens.  Delta Lost Time Coordinator Janet Manns testified that sometimes employees would accidentally punch colleagues in or out if they mis-keyed their own ID number.  She typically learned of such cases when an employee who was incorrectly punched out contacted her, and she often could not identify what had happened until the other affected employee also contacted her regarding the discrepancy.  Plaintiff stated that the only time clock malfunction he had experienced was that sometimes his punches were not accepted, and that he checked online to make sure that his previous day's hours had been recorded.

While a Delta employee, Plaintiff was subject to Defendant's reliability policy.  Pursuant to that policy, Defendant "expect[ed] employees to report on time every day they are scheduled," but did not "designate[] a specific number of occurrences or days of absence that requires an

unacceptable evaluation or administrative action," instead evaluating each employee's case individually. (R. 26–6, Def.'s Reliability Policy at Page ID 947.)

On the afternoon of November 17, 2012, Delta ALA Rob McCreary saw that Plaintiff had punched in for work and therefore asked Performance Leader Kevin Kotula for permission to leave. At 2:43 PM, when McCreary punched out, Plaintiff had not yet arrived in the Control Center. Kotula later saw him arrive "very late" for his shift. (R. 19–4, Kotula Decl. ¶¶ 7–8 at Page ID 400–01.) Kotula brought the matter to his supervisor, Domingo De La Torre, who agreed that the situation should be further explored. Kotula then asked Manns, the Lost Time Coordinator, to review Plaintiff's punches (maintained by Delta) and parking lot swipes (maintained by the Wayne County Airport Authority) for November 17, 2012. On November 19, 2012, Manns told Kotula that on November 17, Plaintiff had punched in at 1:56 PM but did not swipe into the parking lot until 3:04 PM. Kotula then asked Manns to review his parking lot swipes and time clock punches for the preceding thirty days. Based on a printout that Manns provided and had marked up, Kotula found suspicious swipes or punches by Plaintiff on three more dates:

- 10/26/12: punch in at 2:56 PM; parking lot swipe at 3:00 PM;
- 11/6/12: manually filled out PACE slip (hard copy equivalent of punching in) at 2:28 PM; parking lot swipe at 4:19 PM;
- 11/8/12: manual PACE slip for start at 2:28 PM; parking lot swipe at 2:24 PM.[1]

Kotula provided this information to De La Torre, who informed Kotula that he and General Manager Mohammad Sarsour would handle the matter from there. Plaintiff testified that there was "no love lost" between him and Kotula, but did not testify to any evidence of racial bias on Kotula's part. (R. 25–2, Rodriques Dep. at Page ID 804.)

---

[1] Plaintiff later conceded at his deposition that it was impossible to punch in four minutes after arriving at the parking lot.

On December 11, 2012, De La Torre interviewed Plaintiff to inquire about the discrepancies in Plaintiff's time records. In response, Plaintiff wrote the following:

> The first thing I would like to say on my behalf is that no means did I try to defraud the company in any way. The dates that are in question could have been careless on my part by writing the wrong time, not paying attention, like on the 6th of November 2012. I truly believe it was a mistake on my behalf and an oversight due to the work complications that was going on, being I have a job where people don't take kind to the position, because it holds a great amount of responsibility and pressure. On the other dates in question, I was here at my correct times on my hour adjust.

(R. 25–2, Rodriques Dep. at Page ID 790–91.) At the end of the meeting, Plaintiff was escorted off the premises and suspended pending further investigation. Late that afternoon, De La Torre e-mailed General Manager Mohammad Sarsour about the conversation and suspension:

> During the interview I questioned Mr. Rodriques how was it possible to be driving into the parking lot at later times than his punches, he could not give me any valid explanation . . . I explained to him that the number of mistakes and the type of discrepancy between his punches and the swipes arriving at the lot were far too many. In two of which at least 2 hours were paid when he was not even on premises.

(R. 19–10, E-mail, Ex. A to Decl. of Mohammad Sarsour at Page ID 531.) Sarsour in turn contacted Barbara Franz, Delta HR Generalist at the airport. At his deposition, Plaintiff did not recall any comment made or other evidence suggesting racial bias on the part of Kotula or De La Torre.

On December 15, 2012, De La Torre wrote a memo to Sarsour recommending that Plaintiff be terminated because of what he believed to be fraudulent time card submissions. On December 17, 2012, De La Torre and Franz met to review the memo, and Franz then prepared a memo of her own, which she sent to her supervisor, Tyesha Gray, General Manager of Human Resources, recommending that Plaintiff be asked to resign or terminated because he had "fraudulently submitted his time records." (R. 19–6, Memo to Tyesha Gray, Ex F. to Franz Decl.

at Page ID 474.) Franz testified that she was unaware at that time of any allegation of discrimination relating to Plaintiff's case. Plaintiff was terminated on January 9, 2013.

Plaintiff testified at his deposition that he called Delta's Ethics and Compliance Reporting hotline on December 17, 2012 to complain of racial discrimination, and asserted in that call that two white employees, Christopher Culpepper and Jason Conover, had been punished less severely for their disciplinary infractions. Although Plaintiff claimed at his deposition to have identified himself to the hotline in the December 17th call, Delta's records of the confirmation number corresponding to this call indicate that it was made anonymously at 2:20 PM on January 3, 2013. Defendant's records of that call show that the caller also stated that "Fadi Bedoyne" had been suspended on December 28, 2012 for punching in before driving to the parking lot. According to Defendant's records, a total of six calls were placed to the Ethics Hotline between January 3 and January 31, 2013 regarding Plaintiff's case, all of them anonymous. On February 4, 2013, Franz prepared a response to the six calls, in which she stated that Culpepper and Conover had been involved in an infraction that was "not the same" and a "one time incident," whereas two other employees at the airport who were not African-American had been terminated, like Plaintiff, for repeatedly punching into work before they had entered the employee parking lot. (R. 19–6, Compliance Call Report, Ex. L to Franz Decl. at Page ID 504.) Defendant's internal memoranda show that recommendations for termination for Kyle Lilla and Fadi Beydoun, who were both suspended on December 19, 2012, were signed by the Director of Human Resources on January 9, 2013, the same day that Plaintiff was terminated.

At the time Franz prepared the report, she was aware of an incident that occurred on November 16, 2012 involving Christopher Culpepper and Jason Conover. Conover was not feeling well and, after attempting unsuccessfully to contact the Control Center Manager to

request that he be allowed to lie down, contacted Culpepper, who he believed had the authority to remove his tasks. Culpepper did so, but was actually working that day in a capacity that did not authorize him to accommodate Conover's request. Conover then fell asleep for several hours, longer than he had anticipated, and woke up when a colleague texted him that he had missed the flight for which Culpepper had inadvertently left Conover responsible. Conover later admitted in a written statement that upon waking up, he went to his car to retrieve some medicine, and then went out to a gas station for about twenty minutes. Conover was escorted off the premises, docked his pay for the entire day, suspended for four to six days, and issued a Final Corrective Action Notice, known colloquially as a "last chance agreement."

That same day, while working "standby," Culpepper had spent the last several hours of his shift in the break room without informing at least one of the Performance Leaders supervising him, allegedly because there were not enough computers in the Control Center. For these two incidents, Culpepper lost his privileges as an Aircraft Load Agent, was docked four hours' pay, suspended for two work days, and issued a written Corrective Action Notice. Conover's and Culpepper's punches and parking lot swipes for the preceding thirty days were pulled on November 19, 2012, but the record shows no concern by anyone at Delta.

On January 9, 2013, the day Plaintiff was terminated, Delta employee Cassandra LeeAustin e-mailed Franz that Plaintiff had called her asking why Culpepper and Conover had received three-day suspensions; Franz asserted that this was the first time she was aware of a complaint by Plaintiff. On January 21, 2013, Plaintiff wrote a letter appealing his termination through Delta's Equal Opportunity review process. His termination was upheld on April 12, 2013. Plaintiff apparently later contacted the EEOC but never pursued a Title VII claim.

**Procedural History**

On June 10, 2014, Plaintiff filed a complaint in Wayne County Circuit Court in Michigan alleging racial discrimination and retaliatory discharge in violation of Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"). On July 10, 2014, Defendant removed the case to the United States District Court for the Eastern District of Michigan on the basis of diversity of citizenship. Plaintiff filed an amended complaint on July 24, 2014, which continued to allege racial discrimination and retaliatory discharge under ELCRA. After discovery concluded, Defendant moved for summary judgment on January 20, 2015. A hearing was held on the summary judgment motion by the district court, at which time the district court granted summary judgment to Defendant. Plaintiff subsequently moved for reconsideration, which was denied.

**DISCUSSION**

**Standard of Review**

This Court reviews *de novo* a grant of summary judgment. *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 629 (6th Cir. 2014). "Summary judgment is appropriate where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (quoting *Mutchler v. Dunlap Mem'l Hosp.,* 485 F.3d 854, 857 (6th Cir. 2007)). This Court must "view the facts and any inferences reasonably drawn from them in the light most favorable to the party against whom judgment was entered." *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial." *Moran*, 788 F.3d at 204 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## Analysis

### I. Racial discrimination claim

ELCRA forbids employers to "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status." Mich. Comp. Laws § 37.2202(1)(a). Where, as here, a plaintiff seeks to establish discrimination by means of circumstantial evidence alone, courts considering ELCRA cases use the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which the Supreme Court developed in the Title VII context. *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 520 (Mich. 2001); *In re Rodriguez*, 487 F.3d 1001, 1007–08 (6th Cir. 2007). When construing ELCRA, Michigan courts look to federal Title VII jurisprudence to "guide[] . . . [their] interpretation." *Elezovic v. Ford Motor Co.*, 697 N.W.2d 851, 859 (Mich. 2005).

Thus, to establish a prima facie case of employment discrimination under ELCRA, a plaintiff must establish that he or she is "(1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and that (4) others, similarly situated and outside the protected class, were unaffected by the employer's adverse conduct." *Town v. Mich. Bell Tel. Co.*, 568 N.W.2d 64, 68 (Mich. 1997). If a plaintiff makes out a prima facie case, the burden then shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for its employment decision." *Hazle*, 628 N.W.2d at 521. Finally, the burden then shifts back to the

plaintiff to show that the reason given by the employer was "pretext for [unlawful] discrimination." *Id* at 522.

### A. Prima facie case

It is undisputed that Plaintiff, a black man who had been employed by Northwest and Delta for nearly eighteen years prior to his discharge, belonged to a protected class, suffered an adverse employment action, and was qualified for the position from which he was discharged. With respect to whether Plaintiff has made out a prima facie case, the dispute between the parties centers on whether Plaintiff has been able to identify similarly situated Delta employees outside the protected class who were treated more favorably.

Plaintiff points to Jason Conover and Christopher Culpepper as similarly situated white employees who "committed multiple instances of time card fraud without being terminated." (Pl.'s Br. at 44–46.) Plaintiff characterizes the incident with Culpepper removing Conover's tasks (and Conover subsequently falling asleep) as one instance of "time card fraud." According to Plaintiff, Conover committed a separate instance of "time card fraud" when he went out for gas, and Culpepper did the same when he spent several hours in the break room while working standby. Defendant counters that Conover's and Culpepper's conduct was so distinguishable as to make them not comparable; rather, the relevant Delta employees to whom Plaintiff should be compared are Kyle Lilla and Fadi Beydoun, each of whom, Defendant concluded, had punched into work before swiping into the parking lot on several occasions, and whose termination was recommended on the same day.

To complete his prima facie case under ELCRA, Plaintiff must show that he was treated differently from employees outside the protected class "for the same or similar conduct." *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004). Where employee discipline is

concerned, we have held in the Title VII context that "to be found similarly situated, the plaintiff and his proposed comparator must have engaged in acts of '*comparable seriousness.*'" *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (quoting *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002)). In general, "the plaintiff and the employee with whom the plaintiff seeks to compare herself must be similar in 'all relevant aspects.'" *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 654 (6th Cir. 2012) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). Relevant factors include whether the plaintiff and the proposed comparator "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich*, 154 F.3d at 352 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

We have held in the past that one differentiating factor is whether a plaintiff and the proposed comparators "willfully violate[d] . . . policy." *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 479 (6th Cir. 2003) (plaintiff, who twice drove a company truck over 100 miles while off duty, was not similarly situated to employees whose supervisors had approved misuses of vehicles but was similarly situated to a white employee who also drove a company truck twice while off duty). This distinction is salient here: Conover apparently made a good-faith attempt to reach his supervisor, and then fell asleep for much longer than he had intended. Culpepper mistakenly believed that he was working in a capacity that would allow him to remove Conover's tasks, which his former supervisor had allowed him to do. De La Torre, who interviewed Plaintiff regarding the suspicious punches, stated in an e-mail to Franz that he had

told Plaintiff that he considered Plaintiff's time discrepancies too numerous to have been a mistake on Plaintiff's part.

Another differentiating circumstance is that Culpepper and Conover also engaged in fewer, arguably less serious individual instances of willfully taking company time. *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1116 (6th Cir. 2001) (considering "severity and frequency" of conduct to be differentiating circumstances); *Seay* 339 F.3d at 479 (plaintiff and comparator each had two instances of misconduct). Culpepper, who spent several hours in the break room on November 16, 2012, never left the airport while clocked in. Conover left the premises for only twenty minutes on one occasion, whereas Defendant identified four suspicious punches by Plaintiff, two of which resulted in Plaintiff being clocked in for over an hour while not actually on the premises. When confronted, Conover took responsibility for his actions and apologized for them, which Plaintiff did not.

Defendant argues, in essence, that Plaintiff has chosen the wrong comparators. In its view, the relevant comparators are (or should have been) Kyle Lilla and Fadi Beydoun, who are white and Asian, respectively, and are similarly situated to Plaintiff because they were terminated on the same day for suspicious patterns of parking lot swipes and time card punches. Relying on *Douglas v. Eaton Corp.*, 577 F. App'x 520 (6th Cir. 2014), Defendant argues that their dismissal effectively precludes Plaintiff from establishing a prima facie case because Lilla's and Beydoun's dismissal negates any inference of discrimination. *Douglas*, however, was not decided on the basis that the plaintiff failed to establish a prima facie case. The record in *Douglas* contained much less information about the plaintiff's proposed comparators, and we affirmed a grant of summary judgment to the defendant in *Douglas* because the contemporaneous dismissal of employees demonstrated an absence of pretext. *Id.* at 524–25;

*see also Dumas v. Providence Hosp. & Med. Ctrs., Inc.*, No. 286806, 2009 WL 4981152, at \*4 (Mich. Ct. App. Dec. 22, 2009) (similar treatment of major violations by the plaintiff and comparator resolved at the pretext stage). When asked about Beydoun and Lilla by the district court at the summary judgment hearing, Plaintiff's counsel had little to say, but remained firm that Plaintiff was relying on Culpepper and Conover as the similarly situated white employees. We decline Defendant's invitation to second-guess Plaintiff's choice of comparators, but hold that on the record before us, Culpepper's and Conover's conduct was sufficiently dissimilar from Plaintiff's that Plaintiff has failed to meet his burden of making out a prima facie case, and his racial discrimination claim accordingly fails.

## II. Retaliation claim

ELCRA also forbids retaliation "because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing" under the Act. Mich. Comp. Laws § 37.2701(a). Plaintiffs alleging retaliation in violation in ELCRA must establish the following as part of a prima facie case: "(1) that the plaintiff engaged in a protected activity, (2) that this was known by the defendant, (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Rodriguez*, 487 F.3d at 1011 (quoting *Barrett v. Kirtland Cmty. Coll.*, 628 N.W.2d 63, 70 (Mich. Ct. App. 2001)). To establish the required causal connection, Plaintiff "must show that his participation in activity protected by the [ELCRA] was a significant factor in the employer's adverse employment action, not just that there was a causal link between the two." *Id*.

Plaintiff claims that his discharge was in retaliation for his having reported racial discrimination to Defendant's hotline while he was suspended but had not yet been terminated.

(Pl.'s Br. at 57.) Calls to company hotlines have been held to be protected conduct under ELCRA. *Lucia v. Ford Motor Co.*, No. 12-15135, 2014 WL 902697, at *10 (E.D. Mich. Mar. 7, 2014). Plaintiff testified at his deposition that he first contacted the hotline on December 17, 2012 and identified himself when he did so. Defendant's records show that only anonymous calls were placed prior to his dismissal, the first of which was made on January 3, 2013. Given the frequency of the anonymous calls, at least three of which were placed prior to Defendant's finalizing the recommendation for Plaintiff's termination, Defendant could easily have concluded that Plaintiff was behind the calls. Plaintiff has therefore satisfied the first three parts of a prima facie retaliation claim.

The final element of a prima facie case of retaliation—causation—is fatal to Plaintiff's claim. Plaintiff does not show that there was any causal connection between the complaints to the hotline and his discharge beyond his own bare assertion in his brief, let alone that they were a significant factor in his discharge. The requisite causal connection "can be established through circumstantial evidence, such as close temporal proximity between the protected activity and adverse actions, as long as the evidence would enable a reasonable fact-finder to infer that an action had a discriminatory or retaliatory basis." *Rymal v. Baergen*, 686 N.W.2d 241, 257 (Mich. Ct. App. 2004). Establishing causation on the facts of this case would be extremely difficult: De La Torre, who had met with Plaintiff on December 11, 2012 to discuss the time card discrepancies, recommended Plaintiff's termination for fraudulently submitting time records in a memo dated December 15, 2012, two days prior to the date Plaintiff claims he contacted the hotline. De La Torre's recommendation and its reasoning were adopted by Franz, the HR generalist at the airport, and her superior, Tyesha Gray. According to her affidavit, Franz did not know that Rodriques had complained of discrimination until a few hours after his termination.

De La Torre did not know of the hotline calls until he was deposed. In *Reynolds v. Fed. Exp. Corp.*, 544 F. App'x 611, 614 (6th Cir. 2013), we affirmed a grant of summary judgment on a Title VII retaliation claim where an employee of the defendant "contemplated firing the plaintiffs *before* they complained to him," and that reasoning is equally applicable here. Thus, in the absence of evidence that his discharge had a retaliatory basis, Plaintiff's ELCRA retaliation claim fails.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment to Defendant.